Thank you. Good morning, your honors. I'm Michael G. Woods, and I represent defendant and appellant Alfredo Cardwood, who is an agent with the Bureau of Narcotic Enforcement, who has been named in his individual capacity in this lawsuit and has endured this lawsuit for almost four years. And he's also been charged with punitive damages, so his interest in this is paramount. We are splitting time. Respectfully, I would request reserve two minutes. My co-counsel, representing co-defendants, and I are splitting the 15 minutes. I'm going to hopefully take six minutes now and two minutes for reserve, recognizing I'm here at your pleasure, and I'll respond to any questions you have. You've taken on a tricky function here, but just watch the clock. Yes, I appreciate that. Thank you. The clock should be right. No. The clock should be the clock that's to your left. It is. 1405. I've asked my co-counsel to drag me away if I go wrong. All right. Very well. The positions of these appeals have been consolidated. Our positions are similar in some respects, a little bit different in others. There are two major or there are three areas, really, the detention of Mr. Garcia and or his arrest and the issuance of the search warrant. And respectfully, the district court, in our view, misapplied well-established law to the facts of this case. And the district court also made factual errors, which are very clearly demonstrated by the briefs in ruling on Defendant Cardwood's application for qualified immunity. Let me just start with the undisputed facts. And unlike the case you just heard, the case law is well-established. And really, this is really an application of existing law and an application of the facts. Qualified immunity, as we well know, is designed to give officers a break who have to make decisions under certain circumstances and think fast. And the law is clearly established that if a reasonable officer could conclude that the conduct was lawful, they get immunity or stated differently. Whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted, then he's on the hook. I suppose you're going to argue that it must be viewed from the perspective of the officer, not the defendant. Thank you, Your Honor. That demonstrates a key error in our view that the district court made. The district court really emphasized the perception of the accused, Mr. Garcia, rather than looking at the totality of the circumstances, facing the officers, and then making the decision based on the totality of the circumstances known to a reasonable officer. When did Mr. Cardwood hear from Carlisle? I'm sorry. I didn't hear you. When did Cardwood hear from Carlisle about what Garcia had done? I believe it was reported in the briefing after the original passage of the methamphetamine. And where were they at that point? I think they were still at the scene and they got together after the scene of what? Right after Mr. Garcia, according to your account, he opens the pouch. Where are they? They're in the park at that time. And are they both there together? Both who? Carlisle and Cardwood? Cardwood is conducting surveillance from a distance. Or where? Near the park, and I forget what it was, 50 to 75 feet. I'm not certain of the distance, but he was removed. And Carlisle, how does Carlisle communicate to him? I believe they got together after Garcia went to his office and the confidential informant left. But I'm not certain of that. He goes to the office. Yes. Carlisle joins Cardwood. I believe. Is that in the record? It is not in the record. So are you making an oath? No, but you asked me what I believed and I answered your question. No, no, I want to know what you believe, what's in the record. Okay. I want to know what's in the record. The only thing in the record, as I recall, is that Carlisle confirmed that Garcia lifted the flap. We don't know when. But for purposes of my argument, Your Honor, it isn't even necessary to decide that disputed fact, because it's whether a reasonable officer faced with the totality of the circumstances could have concluded that. It is undisputed that Carlisle reported that to Cardwood. It is undisputed that the confidential informant reported that to Cardwood. Now, Cardwood also saw that, but assume he didn't. Assume he didn't. If you still look at the totality of the circumstances. Now, wait a minute. You say Cardwood. Why should I assume anything? I want to know. What does the record show? What did Cardwood say? Well, the reason I'm saying assume he didn't is my position is that Judge Wanger focused on that and said that there is a dispute of material fact. And what I'm saying is even if that were disputed, that wouldn't defeat qualified immunity for several reasons. One, could a reasonable officer who was told by a confidential informant and another officer that something had happened, could they rely on that in determining as one element of the facts whether there was probable cause to think that a crime had been committed? What did Cardwood exactly see? Well, what Cardwood saw, but this is not what was presented to Dougherty, Judge Dougherty who issued the search warrant. This is an error that Judge Wanger made. Judge Wanger erroneously stated. You're going off on a tangent. All right. I ask you, what did Cardwood, what does the record show? What Cardwood said is he saw Mr. Garcia lift the flap. He saw the transfer of the bugler pack. At the time that the confidential informant handed him the bugler tobacco pack, Cardwood saw him lift the flap. That's what he testified. This is outside. This is before the getting of the bugler. This is before. This is at the park. Right. But that is not what, that didn't come up during the search warrant application and that's why Judge Wanger was wrong in finding that on the Frank's claim that Cardwood shouldn't be given qualified immunity. Judge Wanger assumed that Cardwood told Judge Dougherty that Cardwood saw Garcia lift the flap. He did not. That's in the record. It's a verifiable fact. And then Judge Wanger. The moment that Cardwood saw that, why wasn't that probable cause right then and there? Well, I think it was probable cause. But bear in mind, they were all. Plunkett, you know, originally told these officers that shortly after he arrived in the lockdown, he met Robledo. And after getting to know Robledo and gaining his trust, he was approached by Robledo regarding smuggling meth into the facility. Plunkett explained that a few days after speaking with Robledo, he went to court. He explained that while waiting for his appearance, he was approached by John Garcia. Plunkett explained that when Garcia approached him, he was asked by Garcia if he wanted to make some money. Now, with that as a background, when Garcia accepts that bugler pouch, I'm telegraphing this to the other side, seems to me that's probable cause, period. The law, I'm going to answer your question. Yeah, the law is clear that a suspect doesn't have the right to claim or insist when he should be arrested. The officers made a decision that they were going to see where that went. And I don't think there's any violation of civil rights in accordance with that. Judge Wanger, I just want to, my counsel is properly telling me my time's up. Judge Wanger never considered ever that the purpose of the detention and one purpose of the arrest warrant was to seize and recover the meth amphetamine. Arrest warrant? I'm sorry, the search warrant. Search. In spite of any misstatements that Deputy Taylor may have made, any claimed omissions, the fact remains that Judge Daugherty wanted and thought there was probable cause to believe that the meth amphetamine would be in Garcia's presence. Was Judge Daugherty told what the secretary said about Provencio and all that kind of stuff? He was. So the secretary said there was meth amphetamine in the office. Mr. Cardwood described what the secretary said and that Mr. Garcia specifically said it was meth amphetamine and that the secretary said she'd like to see it because she hadn't seen it and that Mr. Garcia told Mr. Provencio flush it down the toilet. If Garcia, if Cardwood was trying to set Garcia up, he wouldn't have disclosed that information to Judge Daugherty because that suggests that Garcia was trying to get rid of an illegal substance. Counsel, I think you better allow your co-counsel to have the rest of the time. Thank you, counsel. I'll get right to the point, Your Honor. Roger Matzke and Officer of the County Counsel at County Merced, we absolutely agree that probable cause was already established. And not only that, if I invite the Court's attention to page ER530 of the record, where in fact, and following, where Judge Daugherty was specifically advised of what had happened at Mr. Garcia's office. Probable cause builds. We started out with the background which Judge Daugherty was presented. By the way, Judge Daugherty, as the record shows, was also the judge who permitted the meth amphetamine to be withdrawn from the evidence, from the evidence. We therefore obviously had some concerns about getting it back. Then you have, as I mentioned in the briefs, then you have a very experienced criminal defense attorney who no doubt has appeared many times in front of Judge Daugherty. It's a local matter. He's a local attorney. And here you have a very experienced attorney who on the street is approached by somebody he doesn't know and supposedly accepts a packet from him. No experienced criminal defense attorney is going to do that, using our own common sense. Then he gets it back to the office and Judge Daugherty is told that he specifically knows about the meth amphetamine being present. What does he do with it? He weighs it. Then he supposedly flushes it down the toilet. As I cite in the briefs and the footnote for authorities, the ethical obligation of an attorney when receiving contraband such as that is not to flush it down the toilet, and that that supposedly was done would be further need for further inquiry by these officers. Or you're going to end up in the same situation as in the Wiley case, U.S. v. Wiley, a kind of a similar case where it was involving a jail, FBI-controlled deal, they put some drugs into the facility and they never recovered it. And the court properly said basically, you guys are stupid. Why did you let go of the contraband? Now it's in the jail. Well, that couldn't happen here. That's why they stopped it. Scalia. Counsel, how is your client distinguished from your co-counsel's client? Are you both in the same legal posture, or is there a significant difference? It was part of a joint team. Deputy Kaler, who's also facing punitive damages on this matter, was in charge of the operation, but under Special Agent Supervisor Cardwood. They both went to Judge Doherty to present the information upon which they were relying. There is no misstatement made by Deputy Kaler. And again, I invite your attention to ER 530 in that area with regards to the statements that were made. Very briefly, if I might, very, very briefly. I'm not sure if you answered my question. Are both Deputies Cardwood and Taylor in the same legal posture here or not? Yes. All right. Very well. Did you have any obligation to tell Judge Doherty the full extent of Plunkett's criminal history? I think, number one, there's no indication that Taylor was aware he was supposedly a three-striker. Number two. No indication of what? That he knew that Plunkett was the guy, the CI's name, that he was a three-striker, which is what, of course, the plaintiff was contending. Furthermore, he did reveal that there were crimes of moral turpitude involved, that he was in jail facing theft charges. Finally, the scenario is significantly less than in Lombardi, and I refer to that in the briefs. I don't want to rehash it. Counsel, you're down to about two minutes for your side. And we're going to hold that. So you may want to hold that. Very well. We'll hear from counsel for Mr. Garcia, Mr. Newhouse. Thank you, Your Honors. I'm kind of working backward from the last point. I believe Plunkett did know. I mean, Taylor did know Plunkett's history. But if he didn't know it, he was obligated to find it out. There's a case that I believe comes from the defendant's papers that explains, when you're using an informant, what you need to determine about the informant's information. Well, they didn't accept it until the man took the pouch. That's correct. And that leads me to my next point. The pouch, Cardwood specifically told Judge Daugherty that the methamphetamine was on the outside of the pouch. He said it twice, the outside of the pouch. It's uncontroverted that the methamphetamine was inside the pouch. You lift up the flap, you tape it in there, you close the flap up, and it's on the inside of the pouch. What I don't understand, is what I tried to say earlier, is why, you know, you have an informant come. The guy's in jail. Everybody knows he's a crook. He's in jail. I mean, that's no surprise. The extent of his criminal background is almost irrelevant, because you know he's untrustworthy from the get-go. Anybody knows that about jailhouse informants. But he comes and he tells the story about being approached by Robledo and then being approached by Garcia. And so this is what the police officers have heard from this guy. And then the next thing they know is this guy accepts a pouch from a plunket. And it seems to me that that's just probable cause right then and there. Well, it may not be conclusive, you might not convince the jury, but probable cause doesn't have to be consistent with the elimination of all innocent explanations. You know, you have to still be riding on the turnip truck, I think, to not understand that criminal defense attorneys don't accept stuff like that from criminals. It doesn't happen unless there's something going on. Did Mr. Garcia have a record? There's a tantalizing statement in the district court's opinion that it's an undisputed fact that Garcia had some kind of a drug-related record. Yes, I believe it was 20 years ago he had a problem. He went to law school after that. He's done his penance, if you were. And Taylor never knew that Garcia had a record. Taylor says that he knew that Garcia had a record, but the facts are that Taylor didn't know he had a record that was sealed. It's in the undisputed facts that he did. But you see the problem I have? I mean, the informant comes in and says this is going on, and it involves this lawyer who approached me. So they get the guy out on a pass, and then the guy takes the tobacco pouch over, and the lawyer takes it. It seems to me that's probable cause to believe that what the guy told you is true, and there's a contraband smuggling situation going on in the prison. I don't see that as establishing that the contraband was going on. What it established is that Garcia took something from Plunkett, who had bugged him twice inside the courthouse, twice outside the courthouse, and was following him back to his office. I mean, criminal defense attorneys don't take stuff like that from people they don't know. I mean, I was told that from about the second day I was in the criminal justice system. Mr. Garcia understood that it was tobacco. He understood what? He understood that what was in the bugler pouch was tobacco. So he was going to take the tobacco and give it to Mr. Robledo in jail from a guy he didn't know. Well, it's not established what he was going to do with it. It's established that he took it from Plunkett because Plunkett had approached him twice in the courthouse and was following him down the street. He approached Plunkett with respect to this operation. That's what Plunkett says. Garcia never says that. That's what Plunkett says. And Plunkett has a history of drug and other moral turpitude convictions. He's a three-striker. He has a record as long as your arm, I believe. What do you do with what the secretary said happened in the office? I'm sorry? What do you do with what the secretary said happened in the office? It's undisputed that Garcia took the package, the bugler package, and took it into his office and looked at it and flushed the amphetamine down the toilet. After they both knew it was methamphetamine. I mean, it seems to me that a search warrant is to go in and look for contraband, and everybody agrees there was methamphetamine in the office. Well, down the toilet. In the office. Right. So what's the matter with a search warrant for that? That's why I look at this case from the point of the United States v. Wiley case. I think the intrusion of the officers in this matter was so complete and total that they don't, that. . . Did a master go along to accompany this search? Yes. But before that, they got the word from Plunkett that. . . This wasn't a search going through files of a defense attorney. This was looking for a substance that everybody agrees was there. Well, they went through everything in the office. They searched everything. They went through files. They went through everything. That was part of the reason the special master was there. But they provided the drugs in the first place. They provided the person to give them to Plunkett. The officers. . . This is the Wiley case all over again. The officers were so involved in this investigation that they were creating it as they went along. They didn't have any real confirmation that anything Plunkett was true. They had that Plunkett and Robledo were cellmates. They had that Robledo knew a woman named, I believe, Sylvia Brown. And that's all they knew. And from that. . . And then they had Plunkett's record. And from that, they created a complete, like, fantasy scenario about what they thought may have been happening. Thank you. Thank you, counsel. Mr. Woods. Briefly, Your Honor. Honors, the only difference in our position with the county were Judge Wanger analyzed statements made by Deputy Taylor and the knowledge of the three strikes, which didn't apply to Cardwood at all. That was really the main distinction. Getting back to the search warrant. In terms of the legal principle, I assume you're both in the same legal category in that the deputies could rely on their knowledge. Absolutely. On their knowledge. Even if the facts are wrong, as long as the deputy perceived the facts to be such, that's enough. Exactly. That was a point I tried to make. And Judge Noonan, when I said, even if you assume that Cardwood didn't see that, the reason I put that in, he could have been mistaken in what he saw and still have the benefit of qualified immunity because the law permits for that. The search warrant had the issue, because if you read Judge Dougherty's order, he was concerned about getting back the meth, which it is undisputed the meth was out there. It was in Garcia's possession. There's no dispute of that. Could a reasonable officer in detaining Garcia, could Cardwood, who observed the transfer, observed the pouch with the meth go into Garcia's hands, observed Garcia take off down the street, knowing that the that was the same MOUs to smuggle into the jail as reported, could he have reasonably assumed that when Garcia left, that he might still have the meth on him? Of course he could. And all he did was detain him. He didn't even arrest him. There's an issue whether it was a detention or arrest under Terry. But he did not tell him he was under arrest. He said, we're freezing it until we get a search warrant. The search warrant had the issue because we had to get back those drugs. That is the legal cause for detaining. It's the legal cause for the search. It was a neutral magistrate who had the facts, including Garcia's efforts to dump it down the toilet, all of which is undisputed. And he made that determination. Really, the cops did nothing more except in the field under exigent circumstances freeze the scene until a neutral judge could pass on it. Thank you, counsel. Your time has expired. The case just argued will be submitted for decision. And the Court will adjourn. Hear me, hear me. All person entitled to have a hand in this case is an honorable United States citizen.
judges: Noonan, O'scannlain, Trott